# Prettyman v. Trenton Transportation Co., Appellant.

*Negligence—Carriers—Steamboat—Injury received in crowd— Judgment n. o. v.*

A carrier must furnish a reasonably safe and sufficient means of ingress and egress for its passengers, and it is likewise incumbent upon it to exercise ordinary care in protecting from danger persons assembled at its stations and wharves. Rudeness and bad manners of strangers and intending passengers, resulting in injury, will not convict a carrier of negligence. Such conduct is not to be anticipated, and the carrier is not required to provide against it. It is bound to use such means as are reasonably necessary to prevent injury to individuals by unusual crowds, but the impossible is not required, and a jury cannot be permitted to draw inferences of negligence in the absence of evidence from which such negligence may be reasonably inferred.

In an action for personal injuries against a company operating an excursion boat, where it appeared that the plaintiff was injured by a disorderly crowd while on a wharf awaiting defendant's steamboat, and it further appeared that the disorder was caused by persons who were unlawfully on the wharf, and that the facilities of the steamboat company were sufficient for all ordinary and expected crowds, and that the proximate cause of the accident was the unexpected crush of the riotous intruders, it was error for the court to refuse to enter judgment for the defendant non obstante veredicto.

·  Argued October 16, 1919.  Appeals, Nos. 153 and 154, Oct. T., 1919, by defendant, from judgment of C. P. No..

1, Phila. County, Sept. T., 1917, No. 420, in the case of Sarah Prettyman, by her father and next friend, George W. Prettyman and George W. Prettyman, in his own right, v. Trenton Transportation Company. Before ORLADY, P. J., PORTER, HENDERSON, HEAD and KELLER, JJ. Reversed.

Trespass for personal injuries. Before SHOEMAKER, J.

The facts are stated in the opinion of the Superior Court.

Verdict and judgment for plaintiff, Sarah Prettyman, for $1,000 and for plaintiff George W. Prettyman, in his own right, for $525, and judgment thereon. Defendant appealed.

*Error assigned,* among others, was the refusal of defendant's motion for judgment non obstante veredicto.

*Benjamin O. Frick,* and with him *Prichard, Saul, Bayard and Evans,* for appellant, cited: Service v. Shoneman, 196 Pa. 63; Cunningham v. Bridge Works, 197 Pa. 625; Kennedy v. Penna. R. R. Co., 32 Pa. Superior Ct. 623; Pittsburgh, etc., v. Hinds, 53 Pa. 512; Putnam v. Broadway, etc., Ry. Co., 55 New York 108.

*Daniel Murphy,* and with him *Isaac D. Levy,* for appellee, cited: Muhlhause v. St. Ry. Co., 201 Pa. 237; Kennedy v. Penna. R. R. Co., 32 Pa. Superior Ct. 623; Greb v. Penna. R. R. Co., 41 Pa. Superior Ct. 70; Coyle v. Phila. & R. Ry. Co., 256 Pa. 496.

OPINION BY ORLADY, P. J., February 28, 1920:

The plaintiffs recovered verdicts,—for Sarah Prettyman, the minor daughter $1,000, and for George Prettyman, the father, $525, in the court below in an action of trespass for personal injuries sustained by the daughter in being trampled upon in a rush of excursionists on

a steamboat of the defendant company.　Separate appeals were taken and argued together.

The defendant owned and operated an excursion boat plying between Philadelphia and Trenton, stopping on occasions at Burlington Island Park, an amusement park on an island in the Delaware river, near Trenton. To make the park accessible there was erected a pier or wharf about 800 feet long by 30 to 40 feet wide, sufficient to accommodate 3,000 people, with a river front T as a landing, of ample proportions and properly safeguarded. Gates were erected at the park end of the wharf to regulate the passage of persons to and from boats to the amusement grounds. The park and the wharf were owned, controlled and operated by the Burlington Island Park Company, the defendant company having but a permit or privilege to stop at the end of the wharf to discharge and receive passengers.

Three Philadelphia churches selected the park as a place for holding a picnic organized by them; and under an arrangement with the appellant the churches sold tickets for transportation from Philadelphia to and from the park by the appellant's boat, they to receive part of the proceeds and have control of all the advertising incidental for the excursion.　On the day of the accident, July 28, 1917, the picnic was held and a large crowd of persons including the minor plaintiff attended. About six p. m. they gathered at the park gate, leading to the wharf, and there waited until about seven p. m., when the boat arrived and the crowd was admitted through the gates.

The controlling facts are not in dispute and the plaintiff's narrative, with that of her present husband, who was with her at the time, may fairly be taken as describing the situation: The boat was supposed to come in at six o'clock, and "all of us got ready for the boat.　When the colored people, who were visitors at the park, but not of the excursion party, saw the boat coming in they broke through the gates and rushed to the front end of

the pier, they rushed and pushed the white people aside, and one hollered 'to hell with the whites,' and others, 'murder, the pier is sinking; the boat is on fire; five men are overboard.' One colored man pulled out a razor, and yelled 'slash them right and left, the boat is moving,' 'there is a baby overboard.' One lady had her baby crushed. The colored people created the disturbance, they were intoxicated. One young man asked them to lookout for the baby, and just at that, six colored men started on this man, and they bit his ear, arm and everything else, and when they tried to get free, to get on the boat the colored girls all jumped to get on the boat and the colored men all started to fight with the white people. I was knocked down by the colored people, they pushed me off my feet. I was knocked unconscious, and when I got home I had marks on my body. A taxicab brought me home. I thought I would be all right next morning, but I was paralyzed and could not move." There is some doubt in her testimony as to the exact place she was injured, whether on the wharf, the gangplank or on the boat, but in the view we take of the case, this is not controlling. The boat was licensed to carry 1,100 persons, and there were 931 passengers that evening from the park to Philadelphia. The approach from the pier or landing wharf to the boat was by a gangplank 4 feet wide, 15 feet long, and the sides were protected by white oak handrails 2 by 2½ inches. There was no intimation of defective construction of the pier, gangplank or boat, nor of inadequate accommodations for a crowd of the size described in the testimony, if the crowd had not been in a riotous and lawless condition, caused by the false clamor of some intruders on the body of the excursionists. There was nothing to indicate that the wharf was unsafe, no child or adult was overboard, the boat was not on fire and it was not moving, but safely moored at the landing. The crew consisted of twenty-one men, and it is not suggested that the number were not adequate or that they

were inefficient. The gangplank was of ample propor-
tion and was of the size and style then in use on all river
excursion boats. The defendant company had no au-
thority or control over the park, its exit gates or the
wharf, all of which were under the exclusive control of
the Park Company. The unexpected crush of the riotous
crowd of persons, in forcing themselves through the
gates and on to the narrow gangplank, was the proxi-
mate cause of the accident, and this conduct the defend-
ant could not reasonably be expected to anticipate or
prevent. The gangplank was necessarily narrow, to ac-
commodate but two persons moving abreast, so that
tickets could be lifted from passengers. The chances
are, that had it been wider, the risk from an excited
crowd would have been enhanced by increasing the num-
ber of people on it. But whether so or not, it had been
sufficient to safely care for like crowds on many similar
occasions.

The controlling question in the light of the admitted
and undisputed facts is whether, under all the circum-
stances, the defendant, as a public carrier, was reason-
ably bound to anticipate this unexpected and unwar-
ranted excitement by an excursion crowd. It was held
in Muhlhause v. St. Ry. Co., 201 Pa. 237, and followed in
Coyle v. P. & R. Ry. Co., 256 Pa. 496 (the general prin-
ciple applying with equal force to this case), "A carrier
must furnish a safe and sufficient means of ingress to,
and egress from its trains. It is likewise incumbent
upon it to exercise ordinary care in protecting from
danger persons assembled at its stations, intending to
depart by its trains. Rudeness and bad manners of
strangers and intending passengers, resulting in in-
juries, will not convict a carrier of negligence. Such
conduct is not to be anticipated, and the carrier is not
required to provide against it. But when a street car
company invites the public to use its line to visit a park,
or other public place of amusement or recreation, and
thereby induces large crowds of people to assemble at

its stations in such places, the corporation must use reasonable care in handling the people, and in protecting them from injuries arising from the conduct of the crowd in entering and leaving its cars: 1 Fetter on Carriers of Passengers, section 102. That many people will collect at the stations on such occasions, the corporation must anticipate and it is obligatory on it to see that its station accommodations and means for assuring the safety of its intending passengers are commensurate to the crowd which is likely to assembly. It is the experience of every one, and especially of those who operate street cars, that large bodies of people awaiting transportation rush on the cars to secure seats immediately on its arrival at the station, regardless of consequences to individuals; and this is true of all classes of people. This fact the corporation is presumed to know and to use proper care in controlling the crowd and guarding against the dangers arising from its probable conduct. What means shall be employed to insure the safety of persons on such occasions must be left to the corporation subject, however, when the question is raised, to the approval or disapproval of the proper legal tribunal."

The facts in these cases are essentially different from the ones presented by this record. The crowd in this case was not larger than ones frequenting the park on similar occasions, and it is not suggested in the evidence that there was ever such disturbance and lawlessness at such meetings. The fact that it was a picnic conducted under church influence, would certainly not indicate that such a disturbance would be likely to occur, or that the defendant company should be put on notice of any unusual demonstration of force and lawlessness. This part of the crowd was law-abiding and orderly, and the sole cause of the disturbance was from other visitors in the park who had no right to get on the boat.

It was clearly shown by uncontradicted testimony, that the facilities for getting to and on the boat were adequate, had the persons conducted themselves in a

reasonable and orderly manner. The experience of the company in handling similar crowds would be a fair gauge of their duty on this occasion. This was an emergent and lawless explosion of irresponsible people that was not indicated by any preceding excursion. Nor was there a time prior to this boisterous rush that would suggest such an occurrence or have warned the defendant to exercise special vigilance.

Kennedy v. Penna. R. R. Co., 32 Pa. Superior Ct. 623, deals with an entirely different situation, where the disorder was long continued, without remonstrance on the part of those in charge of the station. As said in Pittsburgh, Fort Wayne & Chicago Ry. Co. v. Hinds, 53 Pa. 516, "It is not the duty of railroad companies to furnish their trains with a police force adequate to such emergencies. They are bound to furnish men enough for the ordinary demands of transportation, but they are not bound to anticipate or provide for such an unusual occurrence as that under consideration." So too, in this case. Those in charge of the gangplank were simply overmastered, and the only ground upon which the plaintiff could charge negligence would be in not supplying a counter force sufficient to repel the intruders. In Barlick v. B. & O. R. R. Co., 41 Pa. Superior Ct. 87, we held: "Precaution is a duty only so far as there is reason for apprehension, and a jury cannot be permitted to hold parties to a higher standard of care than the law imposes, nor to find anything negligence which is less than a failure to discharge a legal duty. The law does not require anyone to presume that another will be negligent, much less to presume that another may be an active wrongdoer: Philadelphia & Reading Company v. Hummell, 44 Pa. 375." We said in Bright v. Penna. R. R. Co., 69 Pa. Superior Ct. 188, "The degree of care required of a carrier is the highest, in maintaining and guarding those whom it transports against such dangers as may be reasonably anticipated, or naturally expected to occur, but in every case called to our attention in

which the carrier has been held liable, it had either direct or implied control over the agencies which produced the plaintiff's injuries.  It is bound to use such means as are reasonably necessary to prevent injury to individuals from the conduct or presence of unusual crowds in passing to and from its trains, but the impossible is not required of such companies."

The plaintiff was the victim of an unjustifiable act of rudeness from persons, who were impudent intruders on a peaceful body of picnickers, but it is not easy to discover how the defendant company could or should have anticipated such unexpected violence.  Where the facts are either admitted or established by undisputed evidence, it is the duty of the court to declare the law applicable to them.  The rule in such cases is aptly summarized in Hoffman v. Philadelphia Rapid Transit Company, 214 Pa. 89, "We have frequently said that negligence is the want of care under the circumstances.  It does not follow, however, that a jury can be permitted to draw inferences of negligence in the absence of evidence from which such negligence may be reasonably inferred.  A jury cannot be permitted to hold the defendant to a higher standard of care than the law requires.  It is, therefore, of primary importance in every such case that the plaintiff should establish by affirmative testimony some negligent acts from which a jury can infer want of care.  If the evidence does not show, nor tend to show, negligence, there is no question for the jury to determine: Merrigan v. Evans, 221 Pa. 1; Eigenbrodt v. Williamsport, 44 Pa. Superior Ct. 440.

A careful examination of the whole record fails to disclose any lack of care or affirmative act of negligence, direct or inferential, on the part of the defendant, to warrant a submission to a jury.  The defendant's point, for binding instructions, should have been affirmed, and the jury directed to return a verdict in its favor.

The judgment is reversed, and it is ordered that judgment be entered non obstante veredicto for the defendant.